IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MARK MAGAZU, | |
| Plaintiff, | |
| v. | Civil Action No. 24-1107-GBW |
| CHILENO BAY FAMILY OFFICE, LLC, BELPOINTE ASSET MANAGEMENT, LLC, AND SHELDON DYCK, | |
| Defendants. | |

## MEMORANDUM ORDER

At Wilmington this 16th day of May 2025:

Plaintiff Mark Magazu ("Plaintiff" or "Magazu") brings this action against Defendants Chileno Bay Family Office, LLC ("CBFO"), Sheldon Dyck ("Dyck"), and Belpointe Asset Management, LLC ("Belpointe") (collectively, the "Defendants"). Presently before the Court is Defendant Belpointe's Motion to Dismiss (D.I. 8) ("the Motion"). The Motion is fully briefed. (D.I. 8; D.I. 14). For the reasons explained below, the Court DENIES Defendant's Motion. Since the Court was able to resolve Belpointe's motion without oral argument, the Court also DENIES-AS-MOOT Magazu's request (D.I. 15) for oral argument.

## I. BACKGROUND

The following factual allegations are taken as true for purposes of this Motion.[1]

Defendant CBFO is organized as a Delaware limited liability company. D.I. 1-1, Ex. A (the "Complaint") ¶ 3. Defendant Dyck is the Manager and sole member-manager of CBFO and

---

[1] *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

currently resides in Cabo San Lucas, Mexico. Compl. ¶ 5. Dyck founded CBFO in June 2020. Compl. ¶ 25. Defendant Belpointe is a Connecticut limited liability company with a business address in Nevada. Compl. ¶ 4. Plaintiff Magazu resides in Emory, Texas but was a resident of Woolwich Township, New Jersey for matters relevant to the allegations in the Complaint. Compl. ¶¶ 1-2.

CBFO is a multi-family office that provides comprehensive financial management services to high-net-worth families and individuals, including investment management, estate planning, tax strategy, philanthropic guidance, and family governance. CBFO and Belpointe have partnered with each other to provide these services to their clients. The Defendants' business structure is to manage and preserve client wealth across generations, focusing on asset growth, financial security, and legacy planning by utilizing shared resources and a customized approach to managing complex financial affairs. Compl. ¶ 26.

Magazu's employment with Defendants evolved from Magazu's research and contacts with CBFO to determine whether he wanted to become a CBFO client. Magazu and Dyck first met on December 7, 2020, in Cabo San Lucas, Mexico, during which meeting Dyck persuaded Magazu to invest with CBFO. After discussing Magazu's professional background, Dyck initiated a conversation with Magazu about joining Defendants as an employee and potentially a partner. Compl. ¶ 27.

Between December 2020 and January 2021, Magazu and Dyck exchanged extensive emails, phone calls, and text messages discussing Magazu's personal financial account transfer to CBFO, the potential transfer of Magazu's family accounts to CBFO, the potential transfer of accounts of Magazu's associates to CBFO, Magazu's prospective employment, and ultimately an offer of employment to Magazu. Compl. ¶¶ 10, 28.

2

On January 7, 2021, by email, Dyck outlined the services he wanted Magazu to provide and/or coordinate and offered Magazu terms for compensation for his employment with Defendants. The terms were: 1) $200,000.00 base salary, 2) 0.50% bonus for the value of any assets gathered and retained by CBFO (payable to Magazu as 50% cash and 50% equity in CBFO), 3) initial (upon hire) 5% equity option in CBFO, and 4) 2.0% - 8.0% additional equity options in CBFO based on performance. Compl. ¶ 29.

Magazu worked for Dyck, CBFO, and Belpointe for eight months, between January and September 2021. Compl. ¶¶ 29, 42. The Defendants provided a written offer of employment and terms for his compensation. Compl. ¶ 20. This documentation was created and exchanged between Magazu and all Defendants contemporaneously with his work. Compl. ¶ 30. During his time at CBFO, Magazu worked on corporate branding (Compl. ¶ 15), drafted operating documents (Compl. ¶ 43), and coordinated with outside counsel (Compl. ¶ 47). In one instance, Magazu paid $73,652.78 out-of-pocket to the Washington, D.C. design agency, Beveridge Seay, for Defendants' corporate branding services. Defendants never reimbursed Magazu for this expenditure. Compl. ¶ 15.

Dyck instructed Magazu to work with Belpointe to "on-board" as an employee and secure access to CBFO/Belpointe systems and resources, managed by Belpointe. For example, Belpointe conducted and cleared a background check on Magazu, and Belpointe also managed the office, financial, transactional, and technology infrastructure for CBFO, which Magazu utilized extensively as a CBFO/Belpointe employee. Compl. ¶ 34. Belpointe assigned Magazu a company email address, mark@chilenobayfo.com, which was aliased to Belpointe's email system and which was managed, monitored, and owned by Belpointe. Compl. ¶ 35.

Belpointe coordinated with CBFO over the conduct of CBFO's business, with joint rights, interests, and responsibility for shared client assets, among other factors of their close integration. Compl. ¶¶ 26, 48. Belpointe wielded significant authority and control over the conduct of Magazu's work. Magazu could not perform any client-related work outside of Belpointe's regulatory compliance systems and controls and without Belpointe's consent and approval. Magazu had to be trained on Belpointe's policies, systems, and protocols, and he had to conduct his work within Belpointe's standards and requirements. If Belpointe had not cleared Magazu for hiring, he could not have worked for Defendants or been able to provide services to their mutual clients. Magazu continually worked with Belpointe during his entire period of employment. Belpointe provided directives and other communications to Magazu regarding the management of client assets and Defendants' shared business. Compl. ¶¶ 33-39.

Belpointe represents in regulatory filings that CBFO is a Belpointe affiliate and that Belpointe transacts its business as CBFO. Compl. ¶ 20. Belpointe is responsible for CBFO's regulatory compliance matters, and CBFO must comply with Belpointe's regulatory processes and mechanisms. Compl. ¶ 36. Belpointe is responsible for managing the assets and financial transactions of the shared CBFO / Belpointe clients. Compl. ¶ 26. Magazu was hired and managed through Belpointe's processes and with Belpointe's approval and continuously worked with other Belpointe employees. Magazu was directed to work with and through Belpointe, and Belpointe wielded authority and control over the means, manner, and method of Magazu's work. *See* Compl. ¶ 36. Defendants were highly integrated and interdependent on each other for the same business and work that Magazu was engaged in. Compl. ¶ 7.

Defendants terminated Magazu's employment in September 2021. From February 2021 to September 2021, Defendants never paid Magazu any of the promised wages or other

compensation.  Compl. ¶ 52.  Magazu seeks at least 8 months of the value of his $200,000.00 annual base salary, equity positions in CBFO or cash equivalents as promised, reimbursement for his payments to Beveridge Seay, and associated damages, costs, fees, and interest.  Compl. ¶ 53.

## II. **PROCEDURAL POSTURE**

On August 30, 2024, Magazu commenced this action by filing a complaint and summons in the Superior Court of the State of Delaware.  D.I. 1 ¶ 1.  Magazu asserts Delaware state law claims against all Defendants, as joint employers, for breach of contract, promissory estoppel, and unjust enrichment, and a claim against all Defendants under the New Jersey Wage Payment and Collection Act.  D.I. 14 at 1; *see generally* Compl.  CBFO and Dyck removed this case to the District Court of Delaware on October 4, 2024 and, on October 11, 2024, CBFO and Dyck submitted their own Motion to Dismiss.  D.I. 4.  Belpointe submitted this Moton on October 25, 2024.  D.I. 8.  Magazu filed a Response and Opposition Brief to the Motion.  D.I. 14.  Belpointe filed no Reply Brief.  *See* D.I. 15.

## III. **LEGAL STANDARD**

### A. **Rule 12(b)(6)**

Under Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"), a complaint must be dismissed if it "[fails] to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6). The purpose of a Rule 12(b)(6) motion is to test the legal sufficiency of a complaint.  *E.I. DuPont de Nemours & Co. v. Great Lakes Chem. Corp.*, 383 F. Supp. 2d 642, 644-45 (D. Del. 2005).  "To survive a Rule 12(b)(6) motion, a complaint must set forth enough factual allegations to 'state a claim to relief that is plausible on its face.'"  *Klotz v. Celentano Stadtmauer & Walentowicz LLP*, 991 F.3d 458, 462 (3d Cir. 2021) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim for relief is facially plausible "when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

When reviewing a motion to dismiss under Rule 12(b)(6), the Court must "consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010). Additionally, the Court must construe all allegations and facts in the light most favorable to the non-movant plaintiff and resolve all reasonable inferences in the plaintiff's favor. *See Evancho v. Fisher*, 423 F.3d 347, 350 (3d Cir. 2005); *see also Rocks v. City of Philadelphia*, 868 F.2d 644, 645 (3d Cir. 1989). The Court, however, need not accept "bald assertions," "unsupported conclusions," or "unwarranted inferences." *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 n.8 (3d Cir. 1997) (internal quotation marks and citations omitted). Instead, "[t]he complaint must state enough facts to raise a reasonable expectation that discovery will reveal evidence of [each] necessary element" of a plaintiff's claim. *Wilkerson v. New Media Tech. Charter Sch., Inc.*, 522 F.3d 315, 321 (3d Cir. 2008) (internal quotation marks and citations omitted).

**B. <u>Choice of Law</u>**

When a federal court sits in diversity, it applies "state substantive law and federal procedural law." *Chamberlain v. Giampapa*, 210 F.3d 154, 158 (3d. Cir. 2000) (citing *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938)). Which state's substantive law applies, however, is dependent on the choice-of-law rules of the forum state. *See, e.g.*, *Homa v. Am. Express Co.*, 558 F.3d 225, 227 (3d Cir. 2009). Delaware state courts use the "most significant relationship" test, as set forth in the Restatement (Second) of Conflict of Laws (the "Restatement"), in order to determine which law should apply. *Pennsylvania Employee, Benefit Tr. Fund v. Zeneca, Inc.*, 710

F. Supp. 2d 458, 467 (D. Del. 2010) (quoting *Travelers Indemnity Co. v. Lake,* 594 A.2d 38, 47 (Del. 1991) (adopting the most significant relationship test)); *see David B. Lilly Co., Inc. v. Fisher,* 18 F.3d 1112, 1117 (3d Cir. 1994); *In re W.R. Grace & Co.,* 418 B.R. 511, 518-19 (D. Del. 2009); *Corning Inc. v. SRU Biosystems, LLC,* 292 F.Supp.2d 583, 584 (D. Del. 2003) ("Delaware courts apply the most significant relationship test.") (citation omitted). Because choice-of-law analysis is issue-specific, different states' laws may apply to different issues in a single case. *Berg Chilling Sys., Inc. v. Hull Corp.*, 435 F.3d 455, 462 (3d Cir. 2006).

## IV. DISCUSSION

### A. Magazu Adequately Pleads Claims Against Belpointe under *Twombly/Iqbal*

Magazu adequately pleads sufficient facts to pass the *Twombly/Iqbal* test. Under that test, although detailed factual allegations are not required, the complaint must set forth sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see also Iqbal*, 556 U.S. at 663. A claim is facially plausible when the factual allegations allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Iqbal*, 556 U.S. at 663; *Twombly*, 550 U.S. at 555-56.

Belpointe claims Magazu's Complaint fails the *Twombly/Iqbal* test by contending that the Complaint sets forth only conclusory statements "devoid of any supporting factual material." D.I. 8-1 at 8. Belpointe cites the Third Circuit which requires "[p]laintiffs . . . [to] accompany their legal theory with factual allegations that make their theoretically viable claim plausible." *Id.* (quoting *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002)). Belpointe asserts that the Complaint contains little more than threadbare legal conclusions without factual allegations because "the clearest indication that an allegation is conclusory and unworthy of weight

in analyzing the sufficiency of a complaint is that it embodies a legal point." D.I. 8-1 at 9 (quoting *Connelly, v. Lane Constr. Corp.,* 809 F.3d 780, 790 (3d Cir. 2016)).

Belpointe's argument is incorrect. While the Complaint does include legal conclusions, the incorporation of a legal conclusion does not render the entire allegation invalid. So long as the Complaint pleads enough "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," then the Complaint passes the *Twombly/Iqbal* test. *Connelly*, 809 F.3d at 786 (quoting *Iqbal*, 556 U.S. at 678).

Magazu contains sufficient factual content in the Complaint that allows the Court to draw a reasonable inference that Belpointe is liable. For example, Magazu pleads the legal conclusion that he entered into a contract with Defendants, but he also provides factual allegations to allow the Court to draw a reasonable inference that a contract existed. Compl. ¶ 10 ("The offer provided an overview of the work requested from Magazu and stated specific terms for compensation and other remuneration in exchange for his personal services to Defendants.").

## B. <u>Magazu Adequately Pleads a Breach of Contract Claim against Belpointe</u>

Belpointe asserts that Magazu failed to adequately plead a breach of contract claim against Belpointe. D.I. 8-1 at 9. As an initial matter, the parties disagree over which state's law should apply to this claim. Belpointe cites New Jersey law (D.I. 8-1 at 9), but Magazu pleads Delaware law (D.I. 14 at 10). Before undergoing a choice-of-law analysis, however, the Court must determine whether a true conflict exists between the application of New Jersey and Delaware law on this issue. According to conflicts-of-laws principles, where the laws of the two jurisdictions would produce the same result on the particular issue presented, there is a "false conflict," and the Court should avoid the choice-of-law question. *Berg Chilling Sys., Inc. v. Hull Corp.*, 435 F.3d 455, 462 (3d Cir. 2006) (quoting *Williams v. Stone*, 109 F.3d 890, 893 (3d Cir. 1997)); *see also*

8

*Bell Helicopter Textron, Inc. v. Arteaga*, 113 A.3d 1045, 1050 (Del. 2015) ("Delaware courts use a two-part test to determine which sovereign's law to apply when there is a conflict: first, the court determines whether there is an actual conflict of law between the proposed jurisdictions.").

Under New Jersey law, to state a claim for breach of contract, a plaintiff must plead that (1) the parties entered into a valid contract; (2) the defendant failed to perform its contractual obligation; and (3) as a result, the plaintiff sustained damages. *Sheet Metal Workers Int'l Ass'n Local Union No. 27, AFL-CIO v. E.P. Donnelly, Inc.*, 737 F.3d 879, 900 (3d Cir. 2013) (citing *Coyle v. Englander's*, 488 A.2d 1083 (N.J. Super. Ct. App. Div. 1985)). Further, to establish that a valid contract exists, a plaintiff must plead the following: (1) a meeting of the minds; (2) an offer and acceptance; (3) consideration; and (4) reasonably certain contract terms. *See id.* Meanwhile, Delaware law requires that a contract formation have 1) the intent to be bound; 2) sufficiently definite terms; and 3) consideration. *Otto v. Gore*, 45 A.3d 120, 138 (Del. 2012).

Facially, there are clear differences between these two state laws. Without full briefing from the parties, this Court does not have the information to determine if the different laws "would produce the same result" on this issue. *Berg*, 435 F.3d at 462. Furthermore, resolving the case-wide choice-of-law issue in this motion could impact the other motion to dismiss in this case, where the applicability of Delaware law is an open issue. *See* D.I. 11 (arguing that "Delaware law does not apply to the claims" and that "Delaware has no interest in [the] claims").

At the 12(b)(6) stage, however, Delaware courts can defer the choice-of-law analysis if the Complaint pleads viable causes of action under both state laws. *See KT4 Partners LLC v. Palantir Techs., Inc.*, No. CVN17C12212EMDCCLD, 2018 WL 4033767, at *6 (Del. Super. Aug. 22, 2018) (finding that because the plaintiffs "pled a viable cause of action under either California or

9

Delaware law . . . the Court need not address the issue of which law governs at [the 12(b)(6)] stage in the proceedings").

Here, because the Complaint pleads facts that are sufficient for causes of action under both New Jersey and Delaware's breach of contract laws, this claim survives the Motion. First, under New Jersey law, Magazu has provided factual allegations that the parties entered into a valid contract. Magazu has pled adequate facts that there was (1) a meeting of the minds, Compl. ¶ 14 (alleging Magazu provided "acceptance of the compensation terms"); (2) an offer and acceptance, Compl. ¶ 56 ("Defendants offered, in writing, and Magazu accepted."); (3) consideration, Compl. ¶ 29 ("Dyck outlined the services he wanted Magazu to provide and/or coordinate and offered Magazu terms for compensation for his employment with Defendants."); and (4) reasonably certain contract terms, Compl. ¶ 29 ("The terms were: 1) $200,000.00 base salary; 2) 0.50% bonus for the value of any assets gathered and retained by CBFO (payable to Magazu as 50% cash and 50% equity in CBFO); 3) initial (upon hire) 5% equity option in CBFO; and 4) 2.0% - 8.0% additional equity options in CBFO based on performance.").

Second, under New Jersey law, Magazu has provided factual allegations that the defendant failed to perform its contractual obligation. Compl. ¶ 14 ("Defendants failed and refused to pay Magazu any wages or compensation."). Third and finally, under New Jersey law, Magazu has provided factual allegations that he has sustained damages as a result. Compl. ¶ 41 (Magazu "delivered a substantial volume of work.").

The same result occurs under Delaware law. Magazu has identified 1) the intent of the parties to be bound; 2) sufficiently definite terms; and 3) consideration. Compl. ¶ 29.

Under neither state law does Belpointe identify specific elements it claims to be missing from the Complaint. Nevertheless, Belpointe maintains that the Complaint fails to adequately plead a breach of contract claim. Instead, under Belpointe's dismissal theory, Magazu does not claim that an offer of employment was made by Belpointe. D.I. 8-1 at 9. That statement, however, is incorrect. Magazu plainly states that "Defendants offered, in writing, and Magazu accepted, compensation." Compl. ¶ 56.

Belpointe further claims that the Compliant specifically contends the offer of employment was made by defendant, Dyck, and that there is simply no averment in the Complaint which establishes Belpointe had any communication in any way with Plaintiff prior to his alleged employment. D.I. 8-1 at 9. But Belpointe identifies no case law showing that Dyck offering the employment precludes Belpointe from being a party to the contract or that Belpointe must have communicated with Magazu directly.

Moreover, Belpointe argues the view that Magazu fails to plead that Belpointe was aware of any of the alleged terms to the contract. D.I. 8-1 at 9. Again, however, Magazu provides enough factual allegations to signal that Magazu was aware of the terms. Compl. ¶ 56 (professing that "Defendants offered, in writing," the terms of the contract).

Belpointe also argues that Magazu fails to plead any specific or factual information that CBFO and Belpointe have "integrated" "operations and infrastructure" or that Belpointe is an "affiliate, partner, and/or joint employer with CBFO." D.I. 8-1 at 10. According to Belpointe, Magazu only provides generalizations and conclusory statements. *Id.* Yet Belpointe fails to establish how this point is relevant. Magazu has already sufficiently pled that Belpointe was a party to the contract, and Belpointe provides no support for the argument that the cited terms of

"integrated," "operations and infrastructure," and "affiliate, partner, and/or joint employer" are legal conclusions and not factual information.

### C. Magazu Adequately Pleads Promissory Estoppel Against Belpointe

Belpointe next contends that Magazu cannot plead promissory estoppel for two reasons. First, Belpointe asserts that, because Magazu claims there is an express contract between Magazu and the Defendants, the law bars any equitable claims. Second, Belpointe asserts that Magazu does not plead any facts supporting a claim of promissory estoppel against Belpointe. D.I. 8-1 at 10. Both of these contentions, however, fail.

First, the assertion of a breach of contract claim does not preclude a promissory estoppel claim. Belpointe cites the proposition that "the existence of an express contract excludes the awarding of relief regarding the same subject matter based on quantum meruit." *Kas Oriental Rugs, Inc. v. Ellman*, 926 A.2d 387, 392 (N.J. Super. App. Div. 2007). However, Federal Rules of Civil Procedure 8(d)(2) explicitly allows "2 or more statements of a claim or defense alternatively or hypothetically." Fed. R. Civ. P. 8(d)(2). In other words, the Federal Rules allow a party to set out alternative claims and, in this case, the claim for promissory estoppel is an alternative to the claim for breach of express contract.

Second, Magazu adequately pleads in the Complaint a claim for promissory estoppel. Again, the parties assert different states' laws on this issue. Since the laws are different on the surface, the Court will resolve the motion by applying both states laws to the Complaint. In New Jersey, "[p]romissory estoppel is made up of four elements: (1) a clear and definite promise; (2) made with the expectation that the promisee will rely on it; (3) reasonable reliance; and (4) definite and substantial detriment." *Toll Bros., Inc. v. Bd. of Chosen Freeholders of Burlington*, 944 A.2d 1, 19 (N.J. 2008). Meanwhile, the elements of promissory estoppel in Delaware are "(i) a promise

12

was made; (ii) it was the reasonable expectation of the promisor to induce action or forbearance on the part of the promisee; (iii) the promisee reasonably relied on the promise and took action to his detriment; and (iv) such promise is binding because injustice can be avoided only by enforcement of the promise." *Lord v. Souder*, 748 A.2d 393, 398 (Del. 2000) (citation omitted).

Though the surfaces of these two state laws are different, Magazu has asserted factual allegations for each of these elements under both states' laws. First, under New Jersey law, Magazu has indicated that Belpointe provided a clear and definite promise. Compl. ¶ 63 ("Defendants promised Magazu compensation of an annual base salary."). Second, Magazu has claimed that the promise was made with the expectation that the Magazu would rely on it. Compl. ¶ 63 (contending that Belpointe promised the compensation "[i]n exchange for [Magazu's] employment and providing personal services"). Third, according to the Complaint, there was reasonable reliance. Compl. ¶ 64 ("Defendants made this promise to induce Magazu to work for Defendants and understood that Magazu would rely on their promise to agree to work for Defendants."). Fourth, Belpointe purportedly caused definite and substantial detriment. Compl. ¶ 72 (alleging that Magazu incurred costs and expenses of $73,652.78).

The same result occurs under Delaware law. The Complaint alleges that (i) a promise was made, Compl. ¶ 64; (ii) it was the reasonable expectation of the promisor to induce action or forbearance on the part of the promise, Compl. ¶ 63; (iii) the promisee reasonably relied on the promise and took action to his detriment, Compl. ¶ 67; and (iv) such promise is binding because injustice can be avoided only by enforcement of the promise, Compl. ¶ 66 ("Defendants accepted Magazu's work and services but have refused to pay him any of the promised compensation."). Contrary to Belpointe's representations (D.I. 8-1 at 11), Magazu plainly expresses that Belpointe was part of the promise made. *See* Compl. ¶ 66.

Lastly, Belpointe contends that, even if a promise were made, it would have been unreasonable for Plaintiff to rely upon said promise. D.I. 8-1 at 11. Belpointe cites the January 7, 2021 email, which states a "starting point" for further discussions, and a PowerPoint slide that refers to a Potential Phase One of Contribution Areas. D.I. 8-1 at 11. But these phrases do not negate the factual allegations that Magazu otherwise pleads showing reasonable reliance.

**D. Magazu Adequately Pleads an Unjust Enrichment Claim Against Belpointe**

Belpointe asserts that Magazu fails to sufficiently plead a claim of unjust enrichment against Belpointe. D.I. 8-1 at 11. Belpointe's assertion is incorrect. Both parties put forth facially different state laws again, but the Complaint provides a viable cause of action under both state laws. Belpointe cites New Jersey's unjust enrichment law wherein a party must demonstrate that the opposing party "received a benefit and that retention of that benefit without payment would be unjust." *Iliadis v. Wal-Mart Stores, Inc.*, 922 A.2d 710, 723 (N.J. 2007) (quoting *VRG Corp. v. GKN Realty Corp.*, 641 A.2d 519, 526 (N.J. 1994)). "That quasi-contract doctrine also 'requires that plaintiff show that it expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond its contractual rights.'" *Id.* (quoting *VRG Group*, 641 A.2d at 526).

Magazu, in turn, quotes Delaware unjust enrichment law which declares that "[u]njust enrichment is the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience. The elements of unjust enrichment are: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law." *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010) (internal citations and quotation marks omitted).

14

First, under New Jersey law, Magazu clearly demonstrates facts that Belpointe received a benefit of Magazu's service. Compl. ¶ 30 ("Magazu performed his personal services for Defendants."). Next, the Complaint lays out how retention of the benefit that Magazu conferred without payment would be unjust. Compl. ¶ 72 (claiming that Magazu incurred "costs and expenses on Defendants' behalf for branding and design services, in the amount of $73,652.78"). Next, Magazu sets forth allegations how he expected remuneration from Belpointe at the time Magazu performed the services. Compl. ¶ 71 (expecting payment for services when such services were provided at the commencement of Magazu's employment with Belpointe). Finally, Magazu avers that the failure of remuneration to Magazu for the benefit conferred enriched Belpointe beyond its contractual rights. Compl. ¶ 71 (Belpointe was to provide payment in exchange for Magazu's "personal services and work.").

The Complaint also provides sufficient factual allegations for a cause of action under Delaware unjust enrichment law. In the Complaint are claims of (1) an enrichment, Compl. ¶ 30; (2) an impoverishment, Compl. ¶ 72; (3) a relation between the enrichment and impoverishment, Compl. ¶ 72 ("Defendants requested and received the benefit of Magazu's incurring costs and expenses."); (4) the absence of justification, Compl. ¶ 71; and (5) the absence of a remedy provided by law (as an alternate claim, *see* Fed. R. Civ. P. 8(d)(2)).

Specific to this Motion, Belpointe claims that, under New Jersey law, Magazu never asserted how Belpointe benefited from the work Magazu provided. Instead, Belpointe maintains Magazu's alleged work only benefitted CBFO and Dyck. D.I. 8-1 at 11. For example, Belpointe contends that the alleged $73,652.78 expense was "to create CBFO's branding package." *Id.* at 12 (emphasis omitted). However, Magazu has made it clear that this expense was for the "Defendants' exclusive benefit." Compl. ¶ 51.

**E.  <u>Magazu Adequately Pleads a New Jersey Wage Payment Act Claim Against Belpointe</u>**

In the Complaint, Magazu adequately pleads that Belpointe violated the New Jersey Wage Payment Act (the "Act").[2]  The Act requires that employers must pay their employees the full amount of wages due at least twice per calendar month on regular paydays, as may be designated in advance by the employer.  Compl. ¶ 79 (citing N.J.S.A. 34:11-4.2).

Belpointe asserts that Magazu has failed to plead sufficient facts that Magazu was an "employee" or that Belpointe was Magazu's "employer" and, as a result, the Court should dismiss this claim.  Under the Act, "employee" is defined as "any person suffered or permitted to work by an employer, except that independent contractors and subcontractors shall not be considered employees."  N.J.S.A. 34:11-4.1(b).  The New Jersey Supreme Court has adopted the "ABC" test for analyzing whether an individual is an employee or independent contractor.  *Hargrove v. Sleepy's, LLC*, 106 A.3d 449, 458 (N.J. 2015).  The "ABC" test presumes an individual is an employee unless the employer can show, *inter alia*, that the follow three conditions are met:

> (A) Such individual has been and will continue to be free from control or direction over the performance of such service, both under his contract of service and in fact; and
>
> (B) Such service is either outside the usual course of the business for which such service is performed, or that such service is performed outside of all the places of business of the enterprise for which such service is performed; and
>
> (C) Such individual is customarily engaged in an independently established trade, occupation, profession, or business.

---

[2] Since both parties reference the same New Jersey law, no choice-of-law analysis is needed for this claim.

*Id.* at 458. Belpointe contends that Magazu's assertions establish that Magazu was an independent contractor. Belpointe, however, is wrong for two reasons. First, the "ABC" test clearly lays out that it will presume that an individual is an employee unless the employer can show otherwise. *Id.* Thus, the burden is on Belpointe to show that Magazu was an independent contractor.

Second, even applying the conditions of the ABC test to the Complaint, Magazu asserts factual allegations that would satisfy the test. Under part A, Magazu has put forth claims that he was directed in how to provide services. Compl. ¶ 33 (Magazu received "emails containing work directives."). Under part B, Magazu identifies how his service could be a part of the usual course of business. Compl. ¶ 48. ("Magazu attended pitches from various private investment groups and, alongside other CBFO/Belpointe employees, assessed the suitability of these investment opportunities for Defendants' clients."). Finally, under part C, by working with fellow employees, Magazu has advanced facts that could show that his services are not customarily engaged in an independently established trade, occupation, profession, or business. Compl. ¶¶48-49 ("This [work] included designing all company collateral, such as business cards, letterhead, signature blocks, tailored client materials, informational brochures. Magazu worked with outside vendors and other employees to develop and managed CBFO's independent website and digital content.").

## F. **The Court Defers on Which State Law Applies**

In a choice-of-law analysis, Delaware state courts use the "most significant relationship" test, as set forth in the Restatement in order to determine which law should apply. *Pennsylvania Employee, Benefit Tr. Fund*, 710 F. Supp. 2d at 467 (citation omitted). However, when faced with a scenario at the pleading stage where the parties have not fully developed the facts of the case, many courts choose to defer this "most significant relationship" test analysis until later in the case, when a more complete factual record has been developed. *See, e.g., AgroFresh Inc.*, 2018 WL

17

6974947, at *7 & n.6 (citing cases); *Zazzali v. Hirschler Fleischer, P.C.*, 482 B.R. 495, 517 (D. Del. 2012). The Court concludes that this course of action is the right path here, as the relevant inputs for this test are not fully fleshed out in the parties' briefing. *See FinancialApps, LLC v. Envestnet, Inc.*, No. CV 19-1337-CFC-CJB, 2020 WL 3640063, at *5 (D. Del. July 6, 2020), *report and recommendation adopted in part, rejected in part*, No. CV 19-1337-CFC/CJB, 2020 WL 5015447 (D. Del. Aug. 25, 2020), and *report and recommendation adopted in part, rejected in part*, No. CV 19-1337-CFC/CJB, 2020 WL 5422408 (D. Del. Sept. 10, 2020). Thus, the Court defers on the choice-of-law questions for this Motion in this case.

## V. **CONCLUSION**

For the reasons explained above, the Court DENIES Defendant Belpointe's Motion to Dismiss (D.I. 8) and DENIES-AS-MOOT Plaintiff Magazu's request for oral argument (D.I. 15). It is SO ORDERED.

GREGORY B. WILLIAMS
UNITED STATES DISTRICT JUDGE